[Cite as *State v. Sherazee*, 2015-Ohio-4160.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | Hon. Sheila G. Farmer, J. |
| | Hon. Patricia A. Delaney, J. |
| -vs- | |
| | Case No. 2014CAA120082 |
| ZAHIR SHERAZEE | |
| | |
| Defendant-Appellant | O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Delaware County Court of Common Pleas, Case No. 07CRI060321 |
| | |
| JUDGMENT: | Affirmed |
| | |
| DATE OF JUDGMENT ENTRY: | October 2, 2015 |
| | |
| APPEARANCES: | |

For Plaintiff-Appellee

CAROL HAMILTON O'BRIEN
DOUGLAS N. DUMOLT
Delaware County Prosecutor's Office
140 North Sandusky Street, 3rd Floor
Delaware, Ohio 43015

For Defendant-Appellant

WILLIAM T. CRAMER
470 Olde Worthington Road, Suite 200
Westerville, Ohio 43082

*Hoffman, P.J.*

{¶1}  Defendant-appellant Zahir Sherazee appeals the December 23, 2014 Judgment Entry and January 16, 2015 Amended Judgment Entry entered by the Delaware County Court of Common Pleas revoking his judicial release and reimposing the balance of his prison sentence.  Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}  Via Sentencing Entry of April 4, 2008, and via Amended Judgment Entry of June 16, 2008, Appellant was sentenced to a prison term of four years and eleven months and ordered to pay costs.

{¶3}  On March 31, 2010, and via May 6, 2010 Amended Judgment Entry Granting Judicial Release, the trial court granted judicial release for a period not to exceed five years.

{¶4}  On January 26, 2011, the State filed a motion to suspend community control sanctions.  On March 15, 2011, Appellant was reinstated to community control adding additional sanction.  The March 15, 2011 Judgment Entry on Reinstatement of Community Control Sanctions of March 15, 2011, indicated Appellant admitted he was in violation of sanctions "2 and 11 and General Term of Community Control No. 1 as earlier entered by the Court on March 28, 2008."  The trial court then reinstated Appellant's period of Community Control, and ordered Appellant abide by all terms and conditions imposed.

{¶5}  On July 9, 2013, the State again filed a motion to suspend community control sanctions. On July 19, 2013, the State filed an amended motion to suspend community control sanctions.  The State alleged Appellant changed his address without

approval, failed to follow instructions of his probation officer, violated curfew, and gave a positive drug test for steroids.

{¶6} On February 10, 2014, via Judgment Entry on Reinstatement of Community Control Sanctions, the trial court found per Appellant's admissions he was in violation of Sanction Nos. 1, 3, 4 and 6 and General Terms of Community Control Nos. 4 and 8 as earlier entered by the Court on March 28, 2008, and reinstated on March 11, 2011.

{¶7} On March 27, 2014, the State filed an amended motion to suspend community control sanctions adding another violation of Sanction 6 on February 24, 2014.

{¶8} The additional violation states,

> In violation of Sanction No. 6 states: "The Defendant shall not consume or possess any Controlled Substance as defined by Section 3719.01(C) of the Ohio Revised Code." The Defendant tested positive for steroids specifically Nandrolone from a specimen obtained from the Defendant by his Probation Officer on February 24, 2014.

{¶9} The trial court conducted a hearing on the motion on November 7, 2014. The trial court found the only issue in question to be the additional violation of Sanction 6 filed on March 27. 2014.

{¶10} Appellant admitted to the violation, and the trial court found Appellant was in violation of Sanction 6. The trial court found Appellant's judicial release should be revoked and the remaining sentence on Counts one, ten, fourteen and twenty should be imposed.

{¶11} On December 23, 2014, the trial court, via Judgment Entry on Judicial Release Violation, found Appellant in violation of the sanctions of his judicial release. The Court further found Appellant's judicial release should be revoked and the remaining sentence as to Count One imposed. The trial court found Appellant was no longer amenable to judicial release and a prison sentence would be consistent with the purposes and principles of sentencing. The court ordered Appellant should return to prison to serve the balance of the four year eleven month sentence imposed on April 4, 2008. The trial court credited Appellant with 787 days of jail time credit, including the time served before Appellant was granted judicial release. Appellant was also ordered to pay the costs of prosecution.

{¶12} Via Amended Judgment Entry of January 16, 2015, the trial court found Appellant was no longer amenable to judicial release and a prison sentence would be consistent with the purposes and principles of sentencing. The trial court ordered Appellant should return to prison to serve the balance of the four year eleven month sentence imposed on April 4, 2008. The trial court granted 787 jail time credit, including the time Appellant served before being granted judicial release. Again, Appellant was ordered to pay the costs of prosecution.

{¶13} Appellant appeals, assigning as error:

{¶14} "I. THE TRIAL COURT VIOLATED PRINCIPLES OF DUE PROCESS AND APPELLANT'S CONSTITUTIONAL RIGHT TO CONFRONT ADVERSE WITNESSES BY RELYING ON HEARSAY REGARDING THE RESULTS OF DRUG TESTS TO PROVE A COMMUNITY CONTROL VIOLATION.

**{¶15}** "II. THE TRIAL COURT ABUSED ITS' DISCRETION BY REVOKING JUDICIAL RELEASE AND REINSTATING THE PREVIOUSLY SUSPENDED PRISON TERM."

I. and II.

**{¶16}** As Appellant's assigned errors raise common and interrelated issues; we will address the arguments together.

**{¶17}** Appellant argues the trial court erred in finding he violated the terms and conditions of his community control; thereby, revoking his judicial release and ordering he return to prison to serve the remaining balance of his term.

**{¶18}** The trial court granted Appellant's motion for judicial release via Judgment Entry Granting Judicial Release on March 31, 2010, incorporating all conditions set forth in the Amended Judgment Entry on Sentence of June 16, 2008.

**{¶19}** The June 16, 2008 Amended Judgment Entry on Sentence reads, in pertinent part,

6. The Defendant shall not consume or possess any Controlled Substance as defined by Section 3719.01(C) of the Ohio Revised Code.

7. The Defendant, pursuant to the directions of a Probation Officer duly attached to Adult Court Services or the Ohio Adult Parole Authority, shall submit to periodic and random urinalysis testing.

**{¶20}** R.C. 3719.01(C) states,

**{¶21}** (C) "Controlled substance" means a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV, or V.

**{¶22}** Mark Taglione of Delaware County Adult Court Services acted as Appellant's Probation Officer herein. Mr. Taglione testified at the hearing herein,

Q. Thank you. We're here regarding a violation that the defendant had tested positive for a controlled substance; is that correct?

A. That is correct, sir.

Q. When did you receive information that the defendant had tested positive?

A. Let's see. The date it was reported back to me was March 24th, 2014.

Q. Who does your office test through?

A. We test through Alere Toxicology services. And if I may add, Alere Toxicology will send their specimens that has to do with steroid use to a lab called Aegis, A-E-G-I-S.

Q. Did you receive results back regarding this case from those laboratories?

A. I did, sir.

MR. DUMOLT: If I may approach, Your Honor.

THE COURT: You may.

BY MR. DUMOLT:

Q. Mr. Taglione, I'm showing you what's been marked as State's Exhibit 1. Can you look at the date on there and see if that is the old test or the new test?

A. This is the old test.

Q. What was the date on that?

A. 6-24 of '13.

Q. State's Exhibit 2 now.  What are we looking at?

A. This is the newer test.

Q. What is the date on that?

A. 2-24-14.

Q. Who did both of these exhibits refer to?

A. Mr. Zahir Sherazee.

Q. Do both of them indicate - - what do both of them indicate?

A. They were positive for steroids.

Q. Does this give any specifics about what type of steroids they're positive for?

A. On the second one that I have in my hand, it was positive for nandrolone.

Q. Where is it on that sheet?

A. Midway down on the sheet.

Q. I'm sorry, where?

A. Right here (indicating).

Q. And then if you look at the first one, State's Exhibit 1, what does it indicate he's positive for on that?

A. This one - - the older one states it's confirmed positive by GC/MS for steroids.  That's all it indicated on the sheet.

Q. Did you do some follow-up work with the companies to find more information out about what these positive tests were?

A. I did.

Q. Are State's Exhibits 1 and 2 true and accurate copies of the laboratory testing results you had from the urine samples that Mr. Sherazee submitted in this case?

A. Yes.

Q. Who's the one that collected the urine in this case?

A. It was me.

Q. You were the one who supervised it and had it sent out to the lab?

A. That is correct.

* * *

A. I received an e-mail from Dr. Melinda Shelby on Friday, August 15th, 2014.

Q. Can you summarize the contents of that.

A. The main thrust of the letter indicates that specimen R4176471 collected February 24, 2014 was positive for nandrolone. Nandrolone is a synthetic anabolic-androgenic steroid. It is available as various esters in oil solution for intramuscular injection as well as for oral use. 19-norandrosterone and 19-noretiocholanolone are the major metabolites used to detect nandrolone administration. Nandrolone metabolites of endogenous origin have been reported but in general are believed to be

present in concentrations less than 2 nanograms a milliliter, with the exception of pregnant women. Aegis Sciences Corporation uses a cutoff of ten nanogram per milliliter for both 19-NA and 19-NE metabolites.

Q. So the substance that he had present in his system in February of 2014 - - I'm sorry, the 2014 test, I should say.

A. 2-24-14.

Q. The substance he had present in his system at that time was not present at the initial test back in 2013?

A. That is correct. They were two different steroid-type substances, to the best of my knowledge.

Q. You are not a doctor, obviously.

 * * *

Q. The drug in question, the nandrolone that we're here about today, is a controlled substance?

A. To the best of my belief, nandrolone is a controlled substance, according to Ohio Revised Code 3719.41(E)(1)(r) and it is a schedule III.

Q. As an individual on probation, is it a term of his probation that he not possess or consume any controlled substances without a prescription?

A. It is.

Q. Did he provide you a valid prescription for nandrolone?

A. He did not.

Q. Did he provide a valid prescription for the other steroid substance?

A. He did not.

Tr. at 9-15

**{¶23}** Appellant's Expert Witness Dr. Robert Belloto testified,

Q. Mr. Sherazee has retained your services for purposes of reviewing the test results that have been presented to the Court showing the presence of a steroid.

A. Yes.

Q. What documents did you review in regards to that issue?

A. The lab sent me about 400 pages of material on their testing, their litigation packet, I guess they like to call it, after you gave them a subpoena, I guess, and he signed a release.

Q. Would that be the Aegis lab?

A. Yes.

Q. A-E-G-I-S?

A. Yes.

Q. Okay. 400 pages of material regarding what?

A. The testing that was done on the urine samples.

* * *

Q. This is the letter dated 2013. I believe today we're here with regards to a sample given in 2014.

A. Right. That was for the nandrolone. I also have that packet. There was actually no testing for nandrolone. What they do, again, is they test for the metabolites. And the presumption is if I test positive for the

metabolite, then I would have used nandrolone. But nandrolone metabolites are of androgenous origin, like if you eat certain pork - - androstenedione used to be available as a dietary supplement. I don't think it's available any more. But if anybody had any stockpiled and you take them, you would be positive for these metabolites, because it was not a controlled substance back then. Actually, they've declared it to be a controlled substance, but there's actually no evidence that it does anything for muscle building.

Q. Correct me if I'm wrong. Are you saying if there are other substances that a person could ingest, they could - - when they're ingested, they would present metabolites that would be - - potentially create a false positive for the substance that they're testing for here?

A. Right. It goes to how that cutoff is set. You know, unless you tested a sufficiently large population or you have done the appropriate statistical homework, which most don't, you end up using confidence intervals, which are inappropriate for making predictions because prediction intervals are wider. The confidence interval talks about a mean, which is the top peak of the bell-shaped curve. The prediction interval basically talks about the whole distribution.

Q. They did not do prediction interval testing.

A. They gave no interval at all. All they said was that it was positive. They gave some numbers on mass spectrometry, but they didn't calculate what that was. And I didn't take the time to do that, because it tends to take a lot of time. A lot of times, when I do do it for these tests that

are marginal, I get numbers that go down to zero, which means I can't declare them statistically different from zero. So their cutoff - - as I said, I have the paper. I think it would be very enlightening for the Court to read that paper. It is from a statistics magazine. It's not very technical, but I think he makes a lot of good points.

It's very hard to set a limit appropriately. You are making a prediction. Most predictions are wrong, unless you are going to predict from some sort of model.

Q. If the Court has to evaluate and determine whether steroids were found in Mr. Sherazee's system based upon the sample that was presented February 24th of this year, based upon your review of the results from the laboratory by Aegis Corporation, do you think that their conclusion that there is a presence of steroids can be relied upon by this Court?

A. No, not without that margin of error, the false positive/false negative.

Tr. At 29-30; 37-39

**{¶24}** On cross-examination, Dr. Belloto testified,

Q. What was it positive for?

A. They tested positive for nandrolone metabolites, but those are also endogenous.

Q. Without going into what else it could be the source of, is it also a source that you had ingested nandrolone?

A. It could be, yes.

Q. Not could be. Is that one way that it can be - -

A. That's another way that it can be.

Q. You mentioned some other ways; it used to be in supplements in the past. Correct?

A. That's correct. It still might be, but supplements are adulterated.

Q. Regardless, nandrolone is a controlled substance, right or wrong. It's a controlled substance. Fair enough?

A. Yes.

Q. If you got it from a supplement or injected it yourself because you bought it illicitly or you got it prescribed, nandrolone is broken down in nandrolone metabolites.

A. That could be one explanation, yes.

Q. Okay. Since we are here about evidence, you know, we build inferences in courts of law based on evidence here. So that's one thing that could be inferred from the evidence before this Court. Fair enough?

A. Fair enough. That's why I brought up the transitivity paradox.

* * *

Q. The controlled substances in question - - I'm really bad at pronouncing these things. Is stanozolol a controlled substance in Ohio?

A. I believe schedule III.

Q. So both of these are schedule III substances?

A. I believe so.

Q. Do you know anything about Alere or Aegis Laboratories? Are you familiar with their work at all?

A. A little.

Q. Are they widely used by probation departments around the state of Ohio and other places?

A. They've been used by many different companies. I don't really know how they - -

Q. For private companies, as well, you do employee drug testing - - they do it there, as well?

A. Yes.

Q. Have you ever been to any of their laboratories or facilities before?

A. Not to Aegis or Alere.

Q. The gas chromatography and mass spectrometry used to do the analysis in this case, isn't that the same technology that's used for OVI analysis and approved by the department of health when they do blood samples?

A. It depends on what it is. If it's alcohol, they're just using gas chromatography. It depends on what the compound is.

Q. That's the GC of the GC/MS. Correct?

A. That's right.

Q. This is the same type of technology used for marijuana metabolites; they'll say there wasn't marijuana in the system, there were marijuana metabolites?

A. That's correct.

Q. This is deemed to be reliable by the department of health for those type of purposes?

A. Well, what the department of health declares science and what other people think is science are not necessarily the same thing.

Q. But that's what they've deemed at least in Ohio as right?

A. I don't know what their regulations are concerning this. I didn't bother to look that stuff up.

Q. So you haven't testified as an expert witness before on alcohol and drug usage in court?

A. I have. But when I looked at this, I didn't look at any Ohio regulations.

Q. So you have never testified in Ohio before?

A. I mean Ohio regulations concerning this.

Q. I'm talking about the general testing methodology in Ohio. That's one of the approved methods by the department of health. Correct?

A. They have methods that they approve, but again, that doesn't mean there's no false positive/false negative to those tests.

Q. Of course not. That's something they deemed reliable enough to use in a court of law. Fair enough?

A. Again, I question that conclusion.

Q. I am not asking you if you question it, I'm asking if it's true.

A. If they've declared it to be so and you are saying so, I guess it is.

Q. So both of these tests that we are referring to were metabolites of the controlled substance found - - at least evidence of the controlled substances found. Correct?

A. That's correct.

Q. There would not be - - typically, there would not be found the actual substance itself in urine, because it would have already been through the body at that point. We would be looking at blood if we were looking for the substance, not the metabolite?

A. No. Often you can find the original compound secreted in the urine in small amounts.

Q. That would be, even in the case of steroids - - what did you say - - androgenous?

A. Yes.

Q. You could still find those in your urine, the actual substance itself and not the metabolite?

A. Yes.

Q. What's the likelihood of that, rather than finding the metabolite?

A. It depends on the assay and how good it is. We're talking nanogram amounts here, they're very small. So it's very tough to do.

Q. The smaller the quantity, the harder it is to detect those?

A. Yes.

Tr. at 42-43; 45-48.

**{¶25}** Probation-revocation hearings are not subject to the rules of evidence and thus allow for the admission of hearsay evidence. Evid.R. 101(C)(3). The rationale for the exception is that, since a probation revocation hearing is an informal proceeding, not a criminal trial, the trier of fact should be able to consider any reliable and relevant evidence to determine whether the probationer has violated the conditions of his probation. *State v. Miller* (1975), 42 Ohio St.2d 102, 106, 71 O.O.2d 74, 326 N.E.2d 259. The introduction of hearsay evidence into a probation-revocation hearing is reversible error when that evidence is the only evidence presented and is crucial to a determination of a probation violation. *State v. Jones* (May 9, 1991), 8th Dist. No. 58423, 1991 WL 76031, citing *State v. Mingua* (1974), 42 Ohio App.2d 35, 39–40, 71 O.O.2d 234, 327 N.E.2d 791.

**{¶26}** Here, the laboratory test results were not the only evidence presented at trial. Rather, Appellant had previously admitted to the possession/consumption of steroids.

**{¶27}** We find the trial court did not abuse its discretion in revoking Appellant's judicial release, finding Appellant violated the terms and conditions of his community control. The evidence presented demonstrates Appellant tested positive for a controlled substance in addition to a number of other violations of his community control.

**{¶28}** Appellant's expert testified the test revealed nandrolone metabolites in the urine and not nandrolone itself. He testified nandrolone is a controlled substance, which would be very difficult to find in the urine itself.

**{¶29}** The judgment of the Delaware County Court of Common Pleas is affirmed.

By: Hoffman, P.J.

Farmer, J.  and

Delaney, J. concur